PIERCE, Judge.
This is an appeal by Arthur E. Roberts, as Guardian ad Litem of Charles Schivley, an incompetent, plaintiff below, from a Pinal Decree entered by the Circuit Court for Lake County, dismissing a complaint brought for accounting and other relief against Hazel K. Bryant, one of the children of Charles Schivley, and The First State Bank and Trust Company, Eustis, Florida, growing out of a family property dispute between the grown children of the incompetent, after the plaintiff had completed presentation of his evidence upon final trial of the cause.
The main object of the complaint was to have the Court impress a constructive trust on assets of the incompetent, Charles Schivley, currently held by Hazel Bryant and Charles Schivley as joint tenants with right of survivorship, and to have the will of Charles Schivley executed in favor of Hazel, to the exclusion of the other children, declared null and void. All the above incidents were alleged to have occurred as a result of undue influence exerted by Hazel in breach of the fiduciary relationship of the father and daughter.
After various legal maneuvers and the taking of depositions of parties and witnesses, the cause came on for final hearing. The plaintiff presented his case, calling as adverse witnesses Hazel Bryant, her husband, Victor Bryant, and their attorney, Harry E. Gaylord. Pursuant to the defendant’s motion to dismiss, the Court entered a final decree of dismissal in which the Chancellor outlined all the pleadings, the evidence and the questions of law, and most capably disposed of all issues posed and correctly applied the law thereto. It would serve no good purpose to quote at length from this most comprehensive document, but from the decretal part of the decree, we quote as follows:
“1. The complaint is dismissed.
2. The securities consisting of:
Savings Account No. 9438 of First Federal Savings and Loan Association of Eustis, Florida, in the amount of $14,003.12 and accrued interest thereon;
500 shares of common • stock of American Telephone and Telegraph Company;
276 shares of common stock of United States Steel Corporation;
94 shares of preferred stock of United States Steel Corporation;
and cash received by The Florida State Bank and Trust Company, Eustis, Florida, as Guardian of the Property of Charles Schivley, an incompetent person, are owned by Charles Schivley and Hazel K. Bryant as joint tenants with right of survivorship.
3. That Hazel K. Bryant shall release any and all of her interest in any of said cash and/or securities to The First State Bank and Trust Company, Eustis, Florida, as Guardian of the Property of Charles Schivley, an incompetent person, that may be needed for said guardianship proceedings and the care of said Charles Schivley and in the event of the death of said Charles Schivley before the death of Hazel Bryant, said bank as such guardian shall deliver the remainder thereof to said Hazel K. Bryant.”
Realizing as we do that the Chancellor had the advantage of having the witnesses before him and was in a better position to ascertain the facts in this “family squabble,” there is no need to rehash or disturb the findings but we will delve into the background of the case and then proceed to the points raised on appeal.
This is the old, but never happy, story of dissension, mistrust and ill-will among members of a family. To give a clearer pic *814 ture we will go back a few years to a time when this was apparently a happy, congenial and closely-knit family before greed and avarice intruded upon the scene.
Charles and Rosella Schivley, residents of the Pittsburg area of Pennsylvania, during their marriage produced a large family of seven sons and two daughters. One daughter, Mrs. Althea Knott, lived in New Jersey. The other daughter is the defendant here, Hazel K. Bryant, who lives in Eustis, Florida. One son lived in Iowa and the remaining six sons lived near the parents, Apparently, the mother, Rosella Schivley, suffered a lengthy illness during 1963, and on January 31, 1964, she died. During the year preceding her mother’s death, Mrs. Bryant made numerous trips to visit her mother and contributed $700 toward providing home nursing care for her because the father refused to pay the “going rate” for such care. One son contributed $100. The other seven children contributed nothing, giving as excuse that they had their own problems and responsibilities, and as the father could well afford to provide the necessary care for the mother he should do so, and if he chose not to do so, “weli, it was just too bad”. He chose not to do so, and Hazel “filled in”.
Shortly after the mother’s death all of the nine children of Charles Schivley, out of his presence, held a family conference to determine Charles Schivley’s future. An offer was made to one son, Henry, that all the others would assign to him their interest in the homeplace if he would move in and care for the father. Henry declined. In fact, it transpired that none of the children, except Hazel K. Bryant, was willing to accept responsibility for the care of the elderly and somewhat dictatorial father. All of the children then agreed that Hazel should have Charles Schivley’s power of attorney, so that she could look after his affairs.
On February 7, 1964, Hazel Bryant brought her father, Charles Schivley, to her home in Eustis. Shortly thereafter joint bank accounts with the right of survivor-ship were opened in the names of Hazel K. Bryant and Charles Schivley. All stock ownerships of Charles Schivley were changed from the names of Charles and Rosella Schivley to Charles Schivley and Hazel Bryant. Charles executed a new will in favor of Hazel to the exclusion of the other children. The intervenors claim that these things resulted from the undue influence of Hazel K. Bryant which she was allegedly able to exert while keeping the father “isolated” from his other children. Hazel contends that the transfers were made and the new will executed over her objections. It may be worth noting, at least with regard to the “isolation” charge, that Hazel once paid from her personal funds the major portion of the fare for one of the brothers to come from Pennsylvania to visit the father.
From all accounts, things went along smoothly for the Bryants and Charles Schivley until the spring of 1965, when Charles became seriously ill and had to undergo several major operations, one of which was for removal of a tumor on the bladder and which required prolonged and very painful treatment. Hazel testified that she felt that these extremely severe treatments had affected her father’s mind causing him to become incompetent during the summer of 1965, but that she didn’t institute guardianship proceedings as she and her husband were able to look after him.
However, in the fall of 1965, the other children having learned of the extent of Charles’ estate (approximately $80,000) and of the manner in which he proposed to dispose of it, i. e., all to Hazel, two of the brothers came to Hazel’s home unexpectedly and announced their intention of taking Charles back to Pennsylvania. They did take Charles away from Hazel’s house and after several hours had passed she became concerned because her father had no winter .clothes with him, nor did he have the *815 medicines which he needed daily. Hazel called her attorney, who advised calling the Sheriff and also suggested that she seek a competency hearing for Charles. This was done. Charles was declared incompetent and Hazel was named Guardian of his person and The First State Bank and Trust Company was named Guardian of his property. The other eight children then sought and obtained the appointment of Arthur E. Roberts, as Guardian ad litem of Charles Schivley, for the purpose of instituting suit against Hazel and the hank. Seven of the children also retained counsel to intervene in their behalf.
1. By his first point on appeal, the plaintiff raises the question of whether, under the circumstances of this case, a presumption of “fraud and undue influence” is created by law such as to require imposition of a constructive trust where the defendant presents no evidence to refute the allegation of undue influence or fraud. What plaintiff seems to be saying is that there was a presumption of fraud and undue influence which shifted the burden of proof to the defendant and that she failed to meet the burden. This is answered by that portion of the final decree which reads:
“The plaintiff alleged but failed to prove that Hazel K. Bryant used any contrivance or undue influence in the transfer or execution of the will.
“Therefore, * * * the burden of proof never shifted.”
The plaintiff asked the lower Court to rule that Hazel held the assets in trust for Charles Schivley. The plaintiff made no showing of any promise by Hazel, oral or otherwise, to hold the property in trust for Charles, nor was it shown that she misused the assets of the incompetent’s estate for her own benefit. What the plaintiff really seems to be seeking is a declaration that Hazel holds the assets in trust for the intervenors. Certainly no attempt has been made to show that the assets originally belonged to the eight Siblings and for such reasons should be held in trust solely for the use and benefit of Charles, and thence to his children.
In those cases cited by plaintiff, e. g., Kauffmann v. Kauffmann, Fla.App. 1963, 150 So.2d 251, and Botsikas v. Yarmark, Fla.App. 1965, 172 So.2d 277, as supporting the imposition of a constructive trust on the ground of undue influence in violation of a fiduciary relationship, there was a recognizable ascertainable interest, either through inheritance or prior ownership, which was directly traceable to the property or assets upon which the trust was sought to be imposed.
In re Barker’s Estate, Fla. 1951, 52 So.2d 785, is a very interesting case. The facts in Barker were that an elderly man made his housekeeper the sole beneficiary of his will to the exclusion of his heirs at law, who had been named as beneficiaries in his prior wills. After the death of the testator the heirs sought to have the will set aside on the ground of undue influence. The lower Court found for the defendant housekeeper and refused to set aside the will. The Florida Supreme Court affirmed per curiam.
In the case sub judice, plaintiff alleges that Hazel K. Bryant breached a fiduciary relationship arising from the mere fact that she was the daughter and solely responsible for the care of the father. Although the plaintiff alleges that Charles was incompetent at the time of the transfers, it was not proven. The proceeding by which Charles was declared incompetent occurred a year and a half after the transfers. There was a presumption of sanity at the time of the transfers and plaintiff failed to overcome the presumption.
Hallam v. Gladman, Fla.App. 1961, 132 So.2d 198, quotes from Rappaport v. Kal- *816 stein et al., 1946, 156 Fla. 722, 24 So.2d 301, as follows:
“ * * * [T]he law favors a presumption that a gift from a parent to a child is voluntary and that such a relationship is not of so confidential a status as to create the presumption of fraud.”
The burden of proof is upon one alleging fraud and as the plaintiff failed to produce sufficient evidence to shift the burden, it was unnecessary for the defendant to present evidence that no fraud existed.
While it is the usual thing for a parent to provide for all his children as the “natural objects of his bounty” there is no law to prevent the exclusion of some or all of his offsprings; nor does such exclusion necessarily raise a presumption of incompetency of the benefactor or fraud of the beneficiary.
2. Plaintiff poses as his second point here the contention that the Chancellor misconstrued Rappaport v. Kalstein, supra, as holding that a father-child relationship will not admit of such confidential status as to create a presumption of fraud — in other words, a confidential status creating a presumption of fraud cannot arise from a father-child relationship. We do not read the decree as so holding. We read it, instead, as merely finding that in the Rap-paport case it did not. We find no Florida case in which a constructive trust was imposed on such basis, but do find cases in which a constructive trust was imposed where the transfer was from child to parent. See Kauffmann v. Kauffmann, supra.
3. The procedural setting for plaintiff’s third point is somewhat involved but may be explained this way: Hazel Bryant was called as an adverse witness by plaintiff and the children-intervenors, and the so-called Dead Man’s Statute, F.S. Section 90.05 F.S.A., was held by the Chancellor to not apply to her because she was the personal representative of the incompetent. But when the other children of Charles Schivley were called by plaintiff and the children-intervenors as their witnesses — not as adverse witnesses — Section 90.05 was held to apply.
The legal effect of this was that the testimony of the personal representative did not constitute a waiver of the privilege to exclude the testimony of the other interested parties, whereas the testimony of the other children as affirmative witnesses did operate to waive the privilege. Such ruling by the Chancellor is supported by the case of Disbro v. Boyce, Fla.App.1960, 124 So.2d 756. The premise upon which Disbro is predicted is that a personal representative as such has no personal interest in the subject matter of the trust, whereas the children do have such interest; therefore, the personal representative is entitled to invoke the barrier.
4. This last point raised by plaintiff questions the propriety of the Chancel-lo to adjudicate as to assets of the guardianship while the guardianship is still being administered by the County Judge’s Court. However, the plaintiff himself invoked jurisdiction of the Circuit Court and it is difficult to understand how he can now complain of the Circuit Court exercising that jurisdiction. There has been no attempt to usurp the fundamental jurisdiction of the County Judge’s Court and the directions given by the Chancellor in his decree with reference to the assets were well within the purview of his litigious jurisdiction. The Chancellor was merely endeavoring to forestall further litigation of the same point by ordering that in the event Charles should predecease Hazel the assets remaining in the estate of Charles should be delivered to Hazel as the joint owner but not as an heir.
The decree of the Chancellor arrives at this Court clothed with the presumption of correctness, and in the absence of any showing of abuse of discretion his *817 determination will not be overruled. We see no reason to disturb his decree here.
Affirmed.
ALLEN, Acting C. J., and HOBSON, J., concur.